YAZOO & M. V. R. CO. v. PERKINS.  ·  .

[66 South. 273.]

. MASTER AND SERVANT. *Injuries to servant.  Contributory negligence. Safe place to work.*  ·

While it is the ·duty of the master to provide a reasonably safe place for the servant to do his work, and this duty is non-deligable, yet, when the servant is, himself, doing the work for his own safety, and neglects to take the simplest precaution to insure his own safety, which he could do without violating his general instructions, his failure to take the precaution· is his own neglect, and not the master's, and in case of injury in such case the master is not liable.

APPEAL from the circuit court of Warren county.
HON. H. C. MOUNGER, Judge.

Suit by E. L. Perkins against the Yazoo & Mississippi Valley Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Mayes & Mayes,* for appellant.

Defendant's peremptory instruction should have been given for the further reason that, according to plaintiff's own showing, he assumed the risk of the scaffold's condition. For the same reason the court erred in refusing the twenty-fourth and twenty-seventh instructions re-. · quested by defendant. Assumption of the risk is not the

same as contributory negligence; and it was not until the Act of 1914 that it was abolished as a full defense.

Appellee was an experienced carpenter, and if, as a matter of fact, the manner in which Jones directed the scaffold to be repaired was the least improper, appellee was fully aware of this fact. "Q. You had built or constructed a great many scaffolds like the one you have testified about, during your lifetime as a carpenter? A. Yes, sir; I have constructed a good many. Q. You know all about the erection and construction of a scaffold of that kind? A. Yes, sir. Q. You knew how they ought to be constructed? A. Certainly. Q. You thought it was safe when you went on there? A. No sir; I did not. Q. Didn't think it was safe? A. I told him it looked like a trap to me when he had the change made and directed me to put it up that way."

Appellee seeks to avoid the consequence of this admission by insisting that, though believing the scaffold was unsafe, he relied upon the judgment of Jones. If the manner in which Jones directed the scaffold to be repaired was not reasonably safe, and appellee knew this prior to his injury for that matter—if he relied upon the judgment of Jones, having the while this knowledge, he simply assumed the error of that judgment. Knowledge is always charged against its possessor, and it cannot be juggled around under fine spun theories until its possession is of no consequence. Jones' judgment and his directions were the same thing, and if appellee knew the latter was unsafe he knew the other was.

Furthermore, we deny that appellee relied on the judgment of Jones. The evidence clearly shows—and appellee himself states that the cause of the scaffold's fall was the manner in which the end of the plank was nailed. These nails were wholly responsible for the accident. Appellee stated that he, himself, drove the nails "at the direction of the assistant foreman." Not only that, but he stated that Jones told him the exact number to drive—

"two or three." That is to say he states that in the judgment of Jones "two or three" was sufficient. Now let us see whether appellee, as a matter of fact, relied on the judgment of Jones.

"Q. You nailed the end that kicked up? A. Yes, sir. Q. You didn't put any more nails (than Jones directed) in the end that kicked up because you didn't think it necessary? A. I put one more than the assistant told me to. Q. Why didn't you put more than the foreman told you? Tell the jury if the foreman told you the exact number of nails? A. He told me to nail down two or three tenpenny nails, and that would be sufficient, and I put four in there."

In view of his prior admission, the situation of appellee is beyond doubt. There is no such thing in law as supplementing some one else's judgment, and relying on it at the same time. He either did or did not rely on Jones' judgment, and we submit to the court that his own statement shows that he was not willing to rely upon what Jones thought was a sufficient number of nails, and exercised his own judgment about just how many there ought to be; and when he did so, he assumed the risk of the scaffold's fall from that source. This must be the case when the man himself states that he thought the thing was unsafe from the beginning.

*Theo. McKnight,* for appellee.

It is an undisputed fact that Jones directed the change in the scaffolding by the removal of the post, and that he directed that said post be not put back in its original place, but that it be substituted by the nailing down of the plank as described in the record. The falling of the scaffolding is *prima facie* evidence of negligence. Thompson on Negligence, sec. 7650; *Railroad Company* v. *Groome,* 97 Miss. 201; *Green* v. *Banta,* 48 N. Y. Super. Ct. (16 Jones & S.) 156.

Appellant does not deny that Jones, after directing the substitution of the nailing of the plank for the re-

placement of the post, told appellee to go upon and, use said scaffolding; but on these points, content themselves by saying: First that Jones was not a vice principal, but a fellow servant of appellee; second, that appellee was guilty of contributory negligence in that he put one more nail into the plank than he was directed to do by Jones, and in going upon scaffolding as directed by Jones; third, that appellee, by obeying the instructions of Jones to nail down the plank and go upon the scaffolding, assumed the risk of all danger and exonerated appellant of all liability, even though Jones were a vice principal.

Counsel says that Jones was nothing more than an ordinary carpenter in his contractual relations with the master; that he was simply a "time-keeper," left there temporarily to see that the men perform their duty; and in case of dereliction to report them. That this statement does not comport with the record, is most respectfully submitted. Again, they say that he could not be a vice principal because he sometimes worked even when Carr was not present, and they cite the record as to his having been engaged in cutting some paper for his men at the very time when the scaffolding gave way.

In reply to this position of counsel the following is quoted from *Carter* v. *Baldwin,* 81 S. W. 207: "Therefore he was a vice principal, notwithstanding the fact he worked with the men and performed the same character and grade of labor they performed; and it was not error under all the evidence, for the court to assume in the instructions that Gilmore was a vice principal." And, after citing a long list of authorities in support of this proposition, the opinion continues as follows: "As vice principal, it was Gilmore's duty to provide the men with as reasonably safe place to work as the nature of the employment would admit." While the employees of a railroad company engaged "in other work not at all connected with the operation of the cars," in the Heflin

Case, does not come within the provisions of section 198 of the Constitution, because: "They would be in no more danger than any other like employee of any other master," yet, such employees do have the same right as the employees of other masters. Therefore, it follows, that in the instant case the appellant is to be governed by the same rules of law relating to the use of scaffolding, as would govern an individual, or in other words, the common law, as applied between master and servant.

One of these rules of the common law is that the master owes to the servant the duty of providing a safe place, and safe ways and appliances, in and with which to work. *Groome case,* 97 Miss. 208; *Fitzgerald* v. *Southern Ry. Co.,* 6 L. R. A. (N. S.) 214, 337; *Buyers* v. *Carnegie Steel Co.,* 16 L. R. A. (N. S.) 214; *Railroad* v. *Hardy,* 88 Miss. 732, and *Finkbine Lumber Co.* v. *Cunningham,* 101 Miss. 292.

It is out of the fundamental principles of law forbidding the master from escaping liability for the performance of his primary duties to his servant, or his nonperformance thereof, by delegating such duty to another, that the doctrine of vice principal arises. *Miller* v. *Missouri Pac. Ry. Co.,* 32 Am. St. Rep. 673; *Fink* v. *Ice Co.,* 84 Iowa, 322, 51 N. W. 155; *Newberry* v. *Mfg. Co.,* 100 Iowa, 441, 69 N. W. 743, Am. St. Rep. 582; *Haworth* v. *Manufacturing Co.,* 87 Iowa 765, 51 N. W. 68, 62 N. W. 325; *O'Neal* v. *Railway Co.* (Minn.), 51 L. R. A. 590, and notes (S. C., 82 N. W. 1086); *McMahon* v. *Mining Co.,* 95 Wis. 308, 70 N. W. 468, 60 Am. St. Rep. 117; *Van Disen* v. *Letellier,* 78 Mich. 492, 44 N. W. 572; *Ryan* v. *Bagaley,* 50 Mich. 179, 15 N. W. 72, 45 Am. Rep. 35; *Railroad Co.* v. *Patterson,* 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 994; *Baldwin* v. *Railroad Co.,* 75 Iowa, 297, 39 N. W. 507, 9 Am. St. Rep. 479; *Mitchell* v. *Robinson,* 80 Ind. 281, 41 Am. Rep. 812.

"The master is responsible for the negligence of a servant, who stands as his vice principal and direct rep-

resentative, invested with his own authority over inferior
servants, and the latter when injured by such negligence,
are not barred by the doctrine of fellow servants."
*Faren* v. *Sellers,* 36 La. Ann. 1011, 3 So. 363, 4 Am. St.
Rep. 256; *Slater* v. *Chapman,* 67 Mich. 523, 35 N. W. 106,
11 Am. St. Rep. 593; *Lewis* v. *Seifert,* 116 Pac. 629, 11
Atl. 514, 2 Am. St. Rep. 631; *Haworth* v. *Seevers Mfg.
Co.,* 51 N. W. 68; *Gravelle* v. *Minneapolis & St. L. Ry.
Co.* (C. C.), 11 Fed. 569, 3 McCarary, 359; *Mad River &
Co.* v. *Barber,* 67 Am. Dec. 312; *Lindwall* v. *Wood* (C.
C.), 44 Fed. 855; *Stevens* v. *Hannibal & Co.,* 86 Mo. 221.

"A foreman entrusted by the master with control of
the work in which a servant is engaged, and with au-
thority to direct him how, when and where it shall be
done, is a vice principal for whose negligences the mas-
ter is liable to the servants." *Cox* v. *Syenite Granite Co.,*
—— Mo. App. 424. "A foreman with power to hire, dis-
charge, and direct workmen, and to obtain and employ
suitable means and appliances, etc., is not a fellow serv-
ant of a laborer in the employ of the common master."
*Hussey* v. *Coger,* 39 Hun. 639. "A foreman having full
charge of work, and empowered to give all directions to
the workman, is not a fellow servant with the workmen."
*Killmer* v. *Weber,* 81 Hun. 599, 30 N. Y. Sup. Ct. 1103. "A
person who has charge of a mill yard, whose duty it is
to superintend the piling of lumber therein, and under
whose orders the workmen are engaged in the piling, is
a vice principal, though, in hiring and discharging work-
men, he reports to the general superintendent, and ob-
tains his sanction therefor." *Zintek* v. *Stimson Mills
Co.,* 9 Wash. 395, 37 Pac. 340. "An assistant foreman,
having no power to employ or discharge hands, but who
exercises a general supervision over the employees of a
shop, and looks after the machinery therein, is not a fel-
low servant of an operator of one of the machines."
*Dutzi* v. *Geisel,* 23 Mo. App. 676.

"It is only where the master withdraws from the man-
agement of the business, entrusting it to a middleman

or superior servant, or where, as in the case of a corporation, the business is of such a nature that the general management and control thereof is necessarily committed to agents, that the master can be held liable to a subordinate for the negligent act of one thus acting in his stead.'' *Malone* v. *Hathaway,* 64 N. Y. 5, 21 Am. Rep. 573.

''A master who undertakes an operation requiring the use of scaffolding is bound to see that such scaffolding is safe and substantial.'' *Weiler* v. *Isley,* 6 N. Y. St. Rep. 595.

''The duty of the master to furnish his servant a safe place to work and to keep it safe is nondelegable, and the failure of an employee charged with the duty to keep it in that condition was the failure of the master which he could not shift to any other employee.'' *Finkbine Lumber Co.* v. *Cunningham,* 101 Miss. 292.

COOK, J., delivered the opinion of the court.

Appellee recovered a judgment against the appellant for two thousand, five hundred dollars for personal injuries caused by an alleged failure to furnish him with a safe place to work, and from this judgment appellant appeals.

The facts, of record, are about these:

At the time of the injury appellee was a carpenter in the employ of appellant—a member of a squad composed of C. M. Carl, foreman, A. R. Jones, assistant foreman, and three or four other carpenters. This squad was engaged in overhauling and repairing appellant's depot at Magenta. The foreman, Mr. Carl, was absent and Mr. Jones was in charge of the squad in his absence.

In progress of the work it became necessary to construct a scaffold around the four sides of the building. Up to the day of the injury, this scaffold had been used by the workmen in putting on weatherboarding.

This scaffold consisted of running boards or planks some ten feet above the ground, upon which the workmen

stood. These boards were supported by resting on timbers (or "brackets," the workmen call them), extending out at right angles from the sides of the walls, and supported in turn by upright posts at their outer ends. As originally constructed, the running boards were not nailed, but were allowed to lie loose, on their supports, so as to be freely adjusted.

At the northeast corner of the building, where the accident happened, there were three upright posts and brackets supporting the running boards; that is to say, where the running boards on the north and the east sides of the house met at this corner, there was a bracket and post to support each, and one to support their intersecting ends—the three forming a sort of crow's foot.

After the scaffold had been constructed, and had been in use some time, appellant put in a side track, which rounded the building very close to this corner; and some of the scaffolding extended out so far that it prevented the cars from passing this point. To allow the cars free passage, the middle upright post—the one set directly out from the corner—was set in towards the building some fourteen or sixteen inches, and its brackets shortened accordingly. Appellee and another workman made this change; Jones having instructed them to do so.

However, appellee did not go upon the scaffold immediately after this change, nor did he go upon it all, under the very simple circumstances we are here confronted with, and of which appellee complains. It was some ten days later that appellee went upon the scaffold and received the injury.

Upon the day of the occurrence the squad was engaged in putting on roofing; appellee's part of the job being to tack it to the eaves of the house, which extended some four feet beyond the sides of the building.

It seems that the scaffold was too far under the eaves of the house to afford appellee a ready footing; and appellee, observing and appreciating the effect of the change

made at the northeast corner, informed Jones that, if he extended the running boards out at that point far enough to enable him to do the work, they would have no support under their outer ends, and would not be safe, whereupon Jones told him "to go ahead and fix it."

Appellee then pulled the boards out the distance he wanted them (five or six feet), lapping the outer end of one board over that of the other, and nailing the under board at the other end to prevent their tipping up—the boards being about fourteen or sixteen feet long. He testified that Jones told him to do this.

After this was done, appellee went to work. Jones was working also, and at the time of the injury was cutting roofing for appellee to tack. After appellee had been at work some two hours the nails he had driven tore loose, or pulled out, the board tipped up, and he was thrown to the ground, causing his injury.

It is perfectly manifest that appellant was a skilled carpenter and had constructed a great many scaffolds like the one in question; that he knew all about how they ought to be constructed in order to make them safe; that the instructions given by the assistant foreman, if he gave instructions, were of the most general and perfunctory character, no doubt, because the foreman knew that appellee was qualified to do this sort of work without any advice from him. We have given the record a most careful examination, and we are convinced that there was no neglect of duty upon the part of Mr. Jones; that, if the scaffold was unsafe, it was because of the failure of appellee to take the proper precautions to make it safe.

Appellee insists that he did the work according to the instructions of his superior, Mr. Jones, and that when the job was finished according to these instructions it was unsafe. The record shows that following questions to appellee and his replies:

"Q. You thought it was safe when you went on there? A. No, sir; I did not. Q. Didn't think it was safe? A.

I told him it looked like a trap to me, when he had the change made and directed me to put it up that way."

It would not be unfair to say that appellee, knowing the danger, voluntarily elected to take chances; but aside from this view of the case, we are forced to the conclusion, taking the record in its most favorable aspect, that as a matter of fact the scaffold was changed by appellee himself, and that no specific commands or instructions as to how the work was to be done were intended, or given by the assistant foreman. Indeed, the work was of the simplest kind, and the foreman did not limit the workman as to the method of performing it, and at most he only made a suggestion, which appellee was at liberty to accept or ignore as he saw fit. There is nothing in the record to justify the idea that the foreman directed the manner of doing the work, in any proper sense, nor does it appear that he saw the work done; but, on the contrary, it appears that appellee supervised the work. and at least in one particular he attempted to improve the foreman's suggestion.

It is, of course, the duty of the master to provide a reasonably safe place for the servant to do his work, and this duty is nondelegable; but when the workman is himself doing the work for his own safety, and neglects to take the simplest precautions to insure his own safety, which he might have taken without violating his general instructions, his failure to take the precautions is his own neglect, and not the master's.

Reversed and judgment here for defendant.

*Reversed.*